UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:14-cv-81533-ROSENBERG/HOPKINS

BRENDA DONAHUE,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendants.

_____/

## MEMORANDUM OPINION

**THIS CAUSE** is before the Court following the non-jury trial held on May 9 and 10, 2016. This case arises from a car accident between Plaintiff Brenda Donahue and Norma Schneider, a former mail carrier with the United States Postal Service ("USPS"), who was driving a postal service truck at the time of the accident. Ms. Donahue filed this negligence action against the United States of America pursuant to the Federal Torts Claims Act, alleging that Ms. Schneider's negligence caused the accident. *See* DE 6 (Amended Complaint). The United States of America contests both liability and the amount of damages sought by Ms. Donahue. *See* DE 14 (Answer).

### I. INTRODUCTION

The Court first briefly summarizes the background facts before delineating the specific factual findings of the Court.

**A.**    **The Parties**

Brenda and Frank Donahue are married and have lived in the same house on Gallop Drive in the Fox Trail development in Loxahatchee, Florida since 1989. **Trial Tr. Vol. 1 at 27:6-9, 29:13-17, 30:10-14, 82:22-24**. Norma Schneider worked as a mail carrier for USPS until

her retirement in 2016. She delivered the mail to the Donahues' neighborhood for more than 20 years. *Id.* **at 125:24-25, 146:14-19.** She used the same set route, which is set by USPS in order to maximize efficiency and avoid left-hand turns, since the mail carriers drive a special right-hand-turn vehicle that has the steering wheel on the right side. *Id.* **at 122:20-22, 123:7-13.** Ms. Schneider had been driving a right-hand-turn vehicle since 1994. *Id.* **at 124:3.**

**B.   The Accident**

    **1.   Undisputed Facts**

The car accident between Mrs. Donahue and Ms. Schneider occurred on June 19, 2013 at approximately 9:38 a.m. at the intersection of Gallop Drive and Mare Lane in Loxahatchee, Florida. *See* **DE 45 at 2 ¶ A (Pretrial Stipulation).** Mrs. Donahue was traveling north on Gallop Drive in a Ford Explorer, and Ms. Schneider was traveling east on Mare Lane in a right-hand-turn USPS Long Life Vehicle ("LLV"). The two vehicles collided after Ms. Schneider made a right-hand turn from Mare onto Gallup.

The intersection of Gallup and Mare is a four-way stop. **Trial Tr. Vol. 1 at 32:16-19, 150:10-11.** At the time of the accident, overgrown vegetation on the southwest corner of the intersection obscured each driver's view of the other to some extent. *Id.* **at 34:15-20, 63:13-23.** The neighborhood is rural and the roads are lightly trafficked. *Id.* **at 91:4-7.** The roads do not have lines painted on them or a paved shoulder. *Id.* **at 33:14-34:7, 147:5-9.** Mrs. Donahue testified, "[B]ecause the roads are small, you can't pick up speed, you have to pay attention to what you are doing." *Id.* **at 33:24-34:1.**

    **2.   Lay Testimony about the Accident**

        **a.   The Donahues' Testimony**

Mr. and Mrs. Donahue testified that, on the morning of June 19, 2013, after having breakfast with her husband, Mrs. Donahue left her house at 9:30 a.m. for a hair appointment.

2

**Trial Tr. Vol. 1 at 30:9-24, 87:3-88:2.** They testified that the hair appointment was at 10:00 a.m. and it took only 10 minutes to drive from their house to the salon. *Id.* Mrs. Donahue testified that she was not talking to her husband on her cell phone when she pulled out of the driveway onto Gallup Drive. *Id.* **at 32:23-25.**

Mrs. Donahue testified that, as she proceeded north on Gallup Drive, she went around an island in the middle of the road with trees and brush. *Id.* **at 32:12-15.** She was planning to approach the stop sign and take a left onto Mare Lane. *Id.* **at 33:5-7.** She testified that she was driving on the right side of the road, because she had just passed the island. *Id.* **at 33:20-22.**

She did not reach the stop sign, she testified, "[b]ecause out of nowhere I got hit." *Id.* **at 33:8-11, 65:2.** She reiterated several times that the postal truck, "came out of nowhere, it happened quickly," and that the first time she saw the postal truck was "[w]hen she hit me." *Id.* **at 34:10-11, 59:1.** Mrs. Donahue testified that she could see the intersection and her stop sign, but because of the "huge overgrowth" on the southwest corner, she could not see Ms. Schneider's stop sign on Mare. *Id.* **at 34:15-20, 63:13-23.**

Mrs. Donahue testified that the postal truck "swung very wide and fast" and opined, "If she had stopped and proceeded slowly, I would have seen her. She did not stop. . . . I know this area, people run it [the stop sign] all the time, okay, including the mail lady." *Id.* **at 65:7-18.** Mr. Donahue testified that "not only Ms. Schneider, but others, they have a tendency of running through the stop [signs], not only that stop." *Id.* **at 90:17-21.**

Mrs. Donahue testified, "My phone was where I always put it, in the cup holder there, [and] I picked it up and called my husband." *Id.* **at 36:4-5.** She testified that she told her husband, "I have been hit, and I hung up." *Id.* **at 36:7.** The United States introduced Sprint phone records for Mrs. Donahue's cell phone, which show a two-minute phone call from her cell phone to her husband's cell phone at 9:35 a.m. *See* **Defense Ex. 9; Trial Tr. Vol. 1 at 67:7-12.**

3

Mr. and Mrs. Donahue both denied that she was on the phone with her husband when the accident occurred. **Trial Tr. Vol. 1 at 68:10, 88:24-89:1.** She explained that the two-minute call to her husband was placed *after* the accident: "Right after the accident, when I got my phone. His phone rings forever, and I would assume he probably was on the way up and heard the phone and went back to get the phone." *Id.* **at 69:24-70:2.** Thus, she testified that, although she spoke to her husband for only a few seconds, the two minutes on the phone records represent time when "his phone was ringing." *Id.* **at 70:23-71:3.** She testified that her phone conversation with her husband "couldn't have been" two minutes long. *Id.* **at 78:9-11.** When the Court asked Mr. Donahue how long the phone rang before he picked it up, he estimated "Four, five rings, something like that," explaining, "I had to track down my cell phone first. I was getting ready to go out jogging, I didn't have it with me. I had to track down the cell phone and pick it up and then answer." *Id.* **at 115:9-18.**

      b. <u>Ms. Schneider's Testimony</u>

Ms. Schneider testified that she generally reported to work at 7:00 or 7:30 a.m. to begin sorting the mail, and would leave the post office "anywhere from 9:00, 9:30 to noon, depending on the amount of mail that came in that morning." **Trial Tr. Vol. 1 at 122:4-5, 127:2-6.** On the day of the accident, Ms. Schneider testified that she left the post office to begin delivering mail at about 9:15 a.m. *Id.* **at 127:12.** On cross-examination, Plaintiff's counsel attempted to establish that Ms. Schneider had a motive to rush through her route because, if she finished early, she could go home early. *Id.* **at 145:15-146:6.** She admitted that, on the day of the accident, she was able to leave the post office to start her route early because it was a light mail day. *Id.* **at 147:19-21.**

Ms. Schneider testified that she stopped halfway up the block of Mare just before the Mare-Gallup intersection, in order to deliver mail to a box on the side of the road. *Id.* **at 128:3-**

4

**11.** She testified that all of the roads in the Fox Trail development where the Donahues lived were curved; "[t]o approach Mare," she testified, "I had to swing out to the left and back into the right to the stop sign." *Id.* **at 128:12-13.** She testified that she stopped at the stop sign. *Id.* **at 128:15-16.** Then, she testified:

> The corners are big curves, so . . . the stop sign is about where the road -- where the straightest part of the road is.
> Once it starts to curve is right past the stop sign. You stop at the sign, you have to creep around about – probably six to eight feet before you can attempt to see around the corner. At that time, the trees and bushes were solid up to the edge of the road. . . .
> I slowly proceeded around the corner.
> Because the streets are this way, I make a point, I usually have my wheels in the grass, I am circling as close as I can on the right side of the road.

*Id.* **at 128:22-129:5, 130:5-8.** She testified, "I got about a quarter of the way around the corner and the front of [Mrs. Donahue's] vehicle was heading straight at me," in Ms. Schneider's lane. *Id.* **at 131:4-5; 132:3-4.** Ms. Schneider denied that she was in Mrs. Donahue's lane. *Id.* **at 138:5-7; 139:16-20.** However, Ms. Schneider testified, "Her left front corner hit my front - - let's say a hair past center on the left at an angle." *Id.* **at 140:3-4.**

Ms. Schneider testified, "[I] [s]tood on my brakes. . . . I grabbed the wheel as hard as I could and pushed on the brake and pushed as hard as I could and came up out of my seat somewhat." *Id.* **at 131:13-18.** She testified that she "stopped at almost the exact time of the impact." *Id.* **at 131:20.** Ms. Schneider testified that Mrs. Donahue "saw me at the same time [as Ms. Schneider stood on the brake] and she jerked her wheel hard to the right to try to swerve off." *Id.* **at 131:25-132:2.**

Ms. Schneider testified that Mrs. Donahue "looked like she was in a rush" because "from the time I saw her, it was too short a time with me going as slow as I was and almost stopping and her still going, hitting me, after she hit me, she bounced - - she kept going." *Id.* **at 132:11-16.**

5

Ms. Schneider also testified, "I believe [Mrs. Donahue] was on the phone. I can't say positive she was, but it appeared her arm was up by her head" and after the accident, she "ducked up to the right and came back up with the phone." ***Id.* at 132:8-15.** Ms. Schneider testified that she "suspect[ed]" that Mrs. Donahue was on the phone with Mr. Donahue "because of how quickly he showed up after the crash." ***Id.* at 144:5-6.** She admitted that the only reason she believed Mrs. Donahue was on the phone at the time of the crash was that "it appeared her arm was up to her head"; she could not see whether Mrs. Donahue was holding something in her hand. ***Id.* at 156:18-157:1-3.** She testified that Mrs. Donahue had her right arm to her head. ***Id.* at 140:16-19.** Mrs. Donahue testified that she was right-handed. ***Id.* at 57:14-15.**

Ms. Schneider rejected Plaintiff's counsel's suggestion that she should have "inch[ed] up past the stop sign" to "see if there [were] any vehicles coming down Gallup Drive," testifying: "[Y]ou have to make the turn starting at the stop sign because this corner is a big curve. . . . If I proceeded straight from the stop sign, I would practically be in the oncoming traffic lane of the street across because the cross street is not exactly straight across. There is no way to go straight into an intersection like that and make that hard of a turn, you turn with the curve" ***Id.* at 149:20-24, 150:5-9.** She testified, "When you go around that curve, it is a big curve. You go around the curve, you are still in your own lane." ***Id.* at 151:19-20.**

### 3. Expert Testimony about the Accident

#### a. Deputy Sheriff Kevin Romine

The parties offered deposition testimony from Deputy Sheriff Romine, who is deceased, pursuant to Federal Rule of Civil Procedure 32(a)(4)(A). Deputy Romine was trained in accident investigation and had investigated hundreds of accidents for the Palm Beach County Sheriff's Office over the course of his 27-year career. ***Romine Depo. Tr. at 12:1-13:24.*** He was called out to the scene of the accident on June 19, 2013. ***Id.* at 6:1-19.** At the time of his deposition, he did

6

not have an independent recollection of investigating the crash; he answered questions by referring to a report he had previously prepared. *Id.* **at 6:1-9, 21:17-21.** He did not take any photographs or measurements at the scene. *Id.* **at 8:8-11; 11:1-4, 14:19-24.** He described it as a "basic" or "straightforward" crash scene, and noted that it did not call for a detailed investigation because neither driver complained of injuries. *Id.* **at 14:1-3, 15:8-16**.

He "[e]xamined both vehicles, direction of travel of both vehicles, based upon what the occupants of the vehicles told me. And then determined the point of impact and damage to the vehicles." *Id.* **at 7:6-9.** The cars were in the same place as at impact when he examined them. *Id.* **at 7:21-24; 9:8-10.** He testified, "The postal service driver was making a right turn onto Gallop Drive to travel south. And [Mrs. Donahue's vehicle] was making a left turn onto Mare Lane to travel west." *Id.* **at 8:4-7.** His opinion as to the point of impact of the vehicles was unclear:

> Q. And what was the point of impact as you determined it of each of the vehicles?
> A. V1, which is the postal truck, I believe, struck V2's left front.
> Q. So which portion of V1 struck V2's left front?
> A. Looks like the left front struck the right front.
> Q. Okay. So are you saying V1's right front struck V2's left front?
> A. By the diagram.

*Id.* at 7:10-20. He also testified that there was a "little gap" in between the two vehicles. *Id.* **at 8:24-9:4.**

He had the cars moved so he could evaluate the markings on the road. *Id.* **at 10:20-22.** He observed a skid mark on the ground that he opined was from the postal truck. *Id.* **at 9:23-10:6.** He admitted, however, that his report did not mention the skid mark. *Id.* **at 26:24-27:5.** Regarding the mark, he opined: "[A]ll it does is give me an indication what direction the vehicle was traveling and that it hit its brakes and skid." *Id.* **at 27:3-5.**

Deputy Romine concluded that the postal truck was at fault because Ms. Schneider took "too wide of a turn." *Id.* **at 11:9-25.** He concluded this due to "[t]he damage to both vehicles and due to skid marks left by the vehicle in my experience as an accident investigator." *Id.* **at 11:16-**

7

**18.** He testified that, when the accident occurred, Mrs. Donahue "hadn't made the turn yet. [She] was approaching to make [her] turn." *Id.* **at 33:21-22.** He opined that, if the postal truck had "made her correct turn she would have passed [Mrs. Donahue's] vehicle," and "[s]he wouldn't have been in no accident." *Id.* **at 33:12-18.**

He did not issue a citation to either driver. *Id.* **at 21:4-6.** Although he opined that both vehicles could have met and passed each other on their own path with room to spare, he admitted that he did not know how wide the vehicles were. *Id.* **at 32:2-13.**

### b. Plaintiff's Expert: Brian Pfeiffer

Plaintiff presented expert testimony from Brian Pfeiffer, Ph.D., a consulting engineer with a forensic engineering firm. **Trial Tr. Vol. 2 at 28:17-21.** He reviewed depositions of the drivers, witnesses, and people that investigated the crash, as well as photographs of the scene of the accident with the vehicles in their final resting places. *Id.* **at 30:4-16.** He also visited the scene in the summer of 2015 and took measurements. *Id.* **at 30:21-25.** He measured the width of the roadway at 17 feet 8 inches. *Id.* **at 60:17-25.** He used "photogrammetry" to determine where certain evidence was on the roadway. *Id.* **at 34:22-23.** He did not examine the vehicles themselves. *Id.* **at 30:17-18.**

Dr. Pfeiffer testified that the intersection where the accident occurred was an unmarked roadway, with no center lines or edge lines. *Id.* **at 32:5-8.** He testified that there was "a lot of vegetation there in the [southwest] corner which limits visibility as you are approaching the intersection" northbound on Gallop Drive (as Mrs. Donahue was) and eastbound on Mare Lane (as Ms. Schneider was). *Id.* **at 32:15-21.**

Dr. Pfeiffer opined that a "yaw mark" on the roadway was "very important in the analysis" because it came "from the rotation of . . . the Postal Service vehicle," which "tells us a lot about the movement between the impact and final rest." *Id.* **at 36:15-19.** He believed that the

8

yaw mark came from the accident because it "lead[] directly up to the left rear tire" of the postal truck and was "in a location and shape that you wouldn't expect it out of just a normal" traffic pattern. *Id.* **at 36:15-23.** He distinguished the "yaw" mark from a "skid" mark because it had "a little bit of arcing to it, and the shape of it is such that it is clear it is something from a sliding tire, consistent with sliding sideways." *Id.* **at 38:1-3.** He opined that, during or just before the crash, the postal service vehicle "rotated so the right front corner was coming towards [Mrs. Donahue's] vehicle." *Id.* **at 43:10-11.**

Dr. Pfeiffer opined that, based on his impact configuration analysis, "the Postal Service van is obviously over on - - a little over, about three feet or so, where the center line would be if you took an average center line," *id.* **at 42:21-24**, and Mrs. Donahue's vehicle was "approximately a foot and a half over the center of what the roadway would be." *Id.* **at 46:24-47:2**. However, he opined that "the impact occurred in Mrs. Donahue's lane of travel." *Id.* **at 47:7-10**. He opined, "If Mrs. Schneider had not been in Mrs. Donahue's lane of travel, the accident wouldn't have happened regardless of how fast either vehicle was traveling." *Id.* **at 58:9-10.**

Dr. Pfeiffer admitted that he "didn't have all the information [he] needed to do a true momentum exchange" because he did not know the overall weight or weight distribution of the postal service vehicle. *Id.* **at 42:3-15.** He also admitted that he did not "know exactly what the speeds of the two vehicles are," but opined they were traveling "fairly slow" and the impact did not cause "a lot of damage." *Id.* **at 42:25-43:2; 58:3-4.** He testified, "[M]y knowledge is that the speeds are consistent with what you expect not only in a neighborhood like this, in a configuration like this, but also based on the testimony. The testimony of approaching it at 10 miles an hour is not inconsistent with what I see here." *Id.* **at 77:24-78:3.**

    c.  **<u>Defense Expert: William Wright</u>**

The United States presented expert testimony from William Wright, a retired traffic homicide investigator with a degree in mechanical engineering. **Trial Tr. Vol. 2 at 135:7-21.** Mr. Wright has published papers on accident reconstruction topics, teaches, and now runs a private accident reconstruction consulting business. *Id.* **at 135:22-25.**

Mr. Wright visited the scene the day after the accident and used survey equipment to map the intersection of Gallup Drive and Mare Lane. *Id.* **at 143:16-19.** He used the survey information to create a computer aided diagram ("CAD") and, utilizing reference points in the photographs, placed the vehicles into the diagram in their final resting positions. *Id.* **at 143:19-20, 144:25-145:2.** He testified that, based on this diagram and an examination of the damage to the vehicles, he "understood how the vehicles had collided with each other and . . . where the vehicles came to rest. The part I didn't understand is where they had collided. . . . There was no physical evidence documented on the highway for me to know where the crash occurred. I used a [computer] program called CRASH in order to understand that." *Id.* **at 145:13-22.**

Mr. Wright performed CRASH simulations using the weight of the postal service truck and Mrs. Donahue's vehicle, both of which he knew. *Id.* **at 146:20-21.** He opined, "The results of the CRASH three analysis indicated that - - it was one of my initial assumptions, that the [postal service truck] was stopped when it was struck. In order to push the [postal service truck] into the place that we find it at rest, [Mrs. Donahue's] Explorer would have had to be going 17 or 18 miles an hour and ended up in the position that we see." *Id.* **at 149:6-11.** "The takeaway," he testified, "is that both vehicles were on the wrong side of the road. [Mrs. Donahue's] Explorer was traveling at an angle where it was across the center . . . of the road." *Id.* **at 149:25-150:6.** He noted that, in her deposition, Ms. Schneider testified that she "stomped on her brakes and she stopped," *id.* **at 151:14-19**, and he testified that the CRASH simulation "bolsters the notion that she was essentially stopped when she was struck." *Id.* **at 153:20-21**.

10

He opined that, because the postal service truck was a right-hand drive vehicle, Ms. Schneider's "view of the oncoming Explorer would have been slightly delayed from [Mrs.] Donahue's view of the" postal truck. *Id.* **at 154:25-155:5.** He opined, given the mutual view obstruction, "[I]f [Ms. Schneider] could bring her car to a stop before she reached the crash - - before she was struck, . . . the Explorer driver [Mrs. Donahue] also should have been able to stop the vehicle, and if both vehicles were stopped there would have been no crash." *Id.* **at 151:14-19.** He also opined that Mrs. Donahue did not stop because she was distracted: "It was Mrs. Donahue's testimony in her deposition [that] she did not see the postal vehicle until she struck it. Based on geometry and drives I have taken through the scene, there is about four seconds of visibility for the driver to see before she was struck. That means her attention was elsewhere." *Id.* **at 173:3-8.**

Like Plaintiff's expert Dr. Pfeiffer, defense expert Mr. Wright noted that the postal vehicle had rotated or "yawed," and that it was a "big piece of the CRASH three analysis" to find a simulation that would account for this yawing motion. *Id.* **at 155:17-21.** Unlike Dr. Pfeiffer, Mr. Wright did not believe that the mark on the roadway came from this crash. *Id.* **at 170:21-23.**

## II.     FINDINGS OF FACT & CONCLUSIONS OF LAW

### A.     Applicable Law

This action is brought under the Federal Tort Claims Act ("FTCA"). The FTCA is a limited waiver of sovereign immunity for the United States that, with certain exceptions, permits a negligence action against the United States of America to the same extent that such an action would arise against a private individual under like circumstances. *See* 28 U.S.C. § 1346(b)(1). Such claims are governed by the law of the place where the allegedly negligent act or omission occurred. *Id.*

11

Because the accident at issue in the present case occurred in Florida, Ms. Donahue's claim is governed by Florida law. "To maintain an action for negligence [under Florida law], a plaintiff must establish that the defendant owed a duty, that the defendant breached that duty, and that this breach caused the plaintiff damages." *Fla. Dep't of Corr. v. Abril*, 969 So. 2d 201, 204 (Fla. 2007). It is undisputed that, as a fellow motorist, Ms. Schneider owed Ms. Donahue a "duty to use reasonable care on the roadways to avoid accidents and injury to [herself] or others." *Williams v. Davis*, 974 So. 2d 1052, 1063 (Fla. 2007). The disputed elements in the present case are breach, causation, and damages.[1]

"The standard of care applicable to negligence actions under Florida law is one of reasonable care; that which a reasonably careful, prudent, and cautious person would use under the circumstances." *Hensley v. United States*, 728 F. Supp. 716, 721 (S.D. Fla. 1989). Although Florida has adopted a pure comparative negligence rule, "there can be no apportionment of negligence where the negligence of the defendant is not directly a legal cause of the result complained of by the plaintiff. . . . Therefore, a plaintiff is barred from recovering damages where the plaintiff's negligence is the sole legal cause of damages." *Scruggs v. United States*, 959 F. Supp. 1537, 1544-45 (S.D. Fla. 1997).

**B.     The Parties' Theories of the Case**

Plaintiff's theory of the case is that Ms. Schneider failed to use reasonable care in making the right-hand turn onto Gallop Drive because she crossed over the middle of the roadway. According to Plaintiff, Mrs. Donahue was properly on the right half of the road when the crash occurred, and the accident would not have occurred but for Ms. Schneider's negligence. Defendant's theory of the case is that Mrs. Donahue was at fault for the accident because she

---

[1] The parties have stipulated that the United States is liable for any negligence committed by Ms. Schneider because she was acting in the course and scope of her employment with USPS when the accident occurred. *See* DE 45 at 3 ¶ VII(a) (pretrial stipulation); *see also* 28 U.S.C. § 1346(b)(1).

12

failed to stop her car in time to avoid it. Defendant contends that both vehicles were across the middle line, both drivers had an obstructed view, and both drivers were going about the same speed. Defendant contends that Ms. Schneider stopped the postal truck in time to avoid the accident, but Mrs. Donahue failed to do so because she was talking to her husband on her cell phone at the time of the crash.

C.     **The Court's Findings and Conclusions**

To prevail, Plaintiff must demonstrate that Ms. Schneider breached a duty of reasonable care and, in doing so, caused the accident at issue. In her testimony, Mrs. Donahue suggested two possible breaches: that Ms. Schneider was speeding and failed to stop at the stop sign on Mare Lane. **Trial Tr. Vol. 1 at 65:7-18, 90:17-21.** The Court does not find this testimony to be credible. Mrs. Donahue did not directly observe Ms. Schneider doing either: she testified that she did not see the postal truck until it hit her and that she could not see the stop sign on Mare Lane due to the foliage on the southwest corner of the intersection. **Trial Tr. Vol. 1 at 34:10-20, 59:1, 63:13-23.** There was no expert testimony or physical evidence to suggest that Ms. Schneider was speeding: Plaintiff's own expert testified that the speeds of both vehicles were "consistent with what you expect . . . in a neighborhood like this," estimated a speed of 10 miles per hour for both vehicles. **Trial Tr. Vol. 2 at 77:24-78:3.** Ms. Schneider denied that she ran the stop sign. On the whole, the Court found Ms. Schneider's testimony about the accident to be more credible than Mrs. Donahue's, as it was more detailed and specific.[2]

The theory largely pursued by Plaintiff's counsel was that Ms. Schneider breached the duty of care because the postal truck was across the (unmarked) center line of the roadway. Both parties' experts agreed that both Mrs. Donahue and Ms. Schneider were, to some extent, on the wrong side of the road. **Trial Tr. Vol. 2 at 42:21-47:2, 149:25-150:6.** While this might suggest

---

[2] Ms. Schneider was also a disinterested witness, as she is not named as a Defendant in this action and she is now retired from USPS.

13

a comparative negligence analysis, the Court credits Ms. Schneider's testimony that there was essentially no other way for her to make the turn onto Gallup in the postal truck, given that the road was curved and narrow. **Trial Tr. Vol. 1 at 149:20, 150:5-9, 151:19-20.** This testimony is supported by the photographs of the accident scene. *See* **Plaintiff's Composite Ex. 34; Defense Composite Ex. 1.**

Furthermore, the Court finds the opinion of Defendant's expert Mr. Wright as to the cause of the crash—that Ms. Schneider would have avoided the accident by "standing on her breaks," but for the late reaction of Mrs. Donahue—to be more credible than the opinion of Plaintiff's experts, Dr. Pfeiffer and Deputy Romine, for several reasons. First, Mr. Wright's analysis was more thorough than either of the other experts. Mr. Wright utilized a crash reconstruction simulation program and included a momentum analysis using the weights of both vehicles. In contrast, Dr. Pfeiffer admitted that he did not perform a momentum analysis because he did not know the weight of the postal vehicle, and he admitted that he did not attempt to calculate the speeds of the vehicles. Deputy Romine admitted that he did not have an independent recollection of investigating the accident, that he was relying on his report for his testimony, and that he did not perform a formal accident reconstruction analysis. Second, the Court is not persuaded by Dr. Pfeiffer's main criticism of Mr. Wright's analysis: that Mr. Wright failed to account for the "yaw" mark on the roadway. Dr. Pfeiffer testified that this mark was important because it showed that the postal truck "yawed," or rotated. However, Mr. Wright agreed that the postal truck had yawed. Moreover, Mr. Wright's conclusion that the yaw mark did not come from the accident is supported by the fact that Deputy Romine failed to note the mark in his report regarding the accident.

The Court agrees with Mr. Wright that, although both vehicles' views were obstructed and both vehicles were on the wrong side of the road, the crash would not have occurred if Mrs.

Donahue had been driving more attentively. On this point, the Court finds by a preponderance of the evidence that Mrs. Donahue was using her cell phone at the time of the accident. Ms. Schneider testified that she saw Mrs. Donahue's right arm up by her head at the time of the crash, which was consistent with Mrs. Donahue's testimony that she is right-handed. **Trial Tr. Vol. 1 at 140-1619, 57:14-15.** Mrs. Donahue being distracted by use of her cell phone explains why, as she testified, she did not see the postal truck prior to the collision.

This theory is also consistent with Mrs. Donahue's Sprint cell phone records, which show a two-minute phone call between Mrs. and Mr. Donahue at or around the time of the crash. *See* **Defense Ex. 9.** The timing of this phone call was heavily disputed. Plaintiff's position is that Mrs. Donahue made this call *after* the accident, and that the phone records list the call as two minutes long because the records reflect time in which Mr. Donahue's phone was ringing, prior to him picking up. Neither party conclusively proved whether Sprint's cell phone records reflect time in which the phone is ringing but not connected. However, even assuming that the records do reflect this pre-connection time, the Court believes that two minutes is still too lengthy to be consistent with the Donahues' testimony that Mr. Donahue's phone rang only four or five times, and that Mrs. Donahue spoke only a few words—"I have been hit"—before hanging up. **Trial Tr. Vol. 1 at 70:23-71:3, 78:9-11, 115:9-18.** The more likely explanation, supported by a preponderance of the evidence, is that Mrs. Donahue was talking on her phone at the time of the accident.

The Court finds that a comparative negligence analysis is unwarranted in this case because Plaintiff has failed to prove by a preponderance of the evidence that Ms. Schneider breached the duty of care and that such breach was the legal cause of the accident. Although there was evidence that Ms. Schneider's vehicle was left of the (unmarked) center of the road at the time of the accident, given the undisputed narrowness of the roads, Plaintiff has not proven

that this alone was a breach of Ms. Schneider's "duty to use reasonable care on the roadways." *Williams*, 974 So. 2d at 1063; *see also Fayden v. Guerrero*, 474 So. 2d 320 (Fla. Dist. Ct. 1985) (where plaintiff passenger alleged that defendant driver was negligent "in failing to observe the road and to take evasive action in sufficient time to avoid the accident" with another car driving on the wrong side of the road, the trial court erred in directing a verdict in favor of defendant because "the record reveal[ed] evidence upon which reasonable men could differ . . . on the issues of liability and damages").[3] As noted *supra*, there is no credible evidence that Ms. Schneider was speeding or ran the stop sign on Mare Lane.

Moreover, the Court finds that the sole cause of the accident was Mrs. Donahue's distraction, rather than the fact that Ms. Schneider was over the center line. *See Scruggs*, 959 F. Supp. at 1545 ("A plaintiff is barred from recovering damages for loss or injury caused by the negligence of another only when the plaintiff's negligence is the sole legal cause of the damage[.]"). Ms. Schneider testified that she "stopped at almost the exact time of the impact," **Trial Tr. Vol. 1 at 131:20**, and Mr. Wright testified that the crash simulation he performed "bolsters the notion that she was essentially stopped when she was struck." **Trial Tr. Vol. 2 at 153:20-21.** Mr. Wright opined that, if Mrs. Donahue had not been distracted, she also could have stopped her vehicle, and a crash would have been avoided. ***Id.*** **at 151:14-19, 154:25-155:5, 173:3-8.** The Court agrees. Accordingly, the United States is not liable for any damages Mrs. Donahue may or may not have suffered as a result of the accident.

### III.   CONCLUSION

For all of the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that:

---

[3] Plaintiff has not argued that Ms. Schneider being on the wrong side of the road was negligence *per se*. Florida Statute § 316.081(1) provides: "*Upon all roadways of sufficient width*, a vehicle shall be driven upon the right half of the roadway[.]" (Emphasis added.)

1. Plaintiff Brenda Donahue is not entitled to judgment in her favor on her claim for negligence, and she shall take nothing.

2. Final judgment will be entered in a separate order.

3. The Clerk of Court is directed to **CLOSE THIS CASE**.

**DONE AND ORDERED** in Chambers, Fort Pierce, Florida, this 13th day of June, 2016.

									_____
									Robin L. Rosenberg
									United States District Judge

Copies furnished to all counsel of record.